**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **FEDERAL INSURANCE COMPANY,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **No. 09 C 1634** |
| ) | |
| ) | |
| **ILLINOIS FUNERAL DIRECTOR'S** ) | |
| **ASSOCIATION., et al.,** ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM OPINION

SAMUEL DER-YEGHIAYAN, District Judge

This matter is before the court on the parties' cross motions for summary judgment. For the reasons stated below, we grant Plaintiff Federal Insurance Company's (Federal) motion for partial summary judgment and dismiss the remaining counts. We also deny Defendants' motion for summary judgment.

## BACKGROUND

Federal alleges that it issued ForeFront Portfolio Policy No. 8169-9276 to Defendant Illinois Funeral Director's Association (IFDA), as named insured and parent company of Defendant I.F.D.A. Services, Inc. (IFDAS). ForeFront Portfolio

Policy No. 8169-9276 allegedly provided insurance coverage to Defendants during the periods from August 11, 2005 to August 11, 2006 (2005 Policy), August 11, 2006 to August 11, 2007 (2006 Policy), August 11, 2007 to August 11, 2008 (2007 Policy), and August 11, 2008 to August 11, 2009 (2008 Policy)(collectively referred to as "Policies"). The Policies allegedly contained a Directors & Officers Liability Coverage Section (D&O Section), which specified that Federal would pay "Loss . . . resulting from any D&O Claim first made against an Insured Person during the Policy Period . . . for Wrongful Acts . . ." and "Loss . . . resulting from any Insured Organization Claim first made against such Insured Organization during the Policy Period . . . for Wrongful Acts." (Compl. Par. 33).

Federal alleges that Defendants are administrators of a pre-need burial trust fund (Trust), which was established by IFDA. (Compl. Par. 46). Federal also alleges that on June 21, 2006, the Illinois Office of the Comptroller, Cemetery Care and Burial Trust Division (IOC) sent a letter (IOC Letter) to IFDAS, which allegedly stated that, based on the IOC's audits of IFDA, it appeared that IFDAS had taken "unauthorized excess fees of approximately $8.6 million from fiscal year-end 2000 to fiscal year-end 2005." (Compl. Par. 39). In addition, the IOC Letter allegedly stated that "an additional $793,163 was owed" to the Trust, based on what the annual yield of the Trust would have been during the time period in question had IFDAS not

taken such fees. (Compl. Par. 39). The IOC Letter also allegedly noted that the "'discrepancy, exacerbated by other practices contributing to the under-funding of the [T]rust,' raised a number of 'serious concerns regarding the state of the [T]rust and the overall lack of formal compliance procedures.'" (Compl. Par. 40). Federal alleges that the IOC Letter also indicated that the IOC had "determined that the [T]rust was under-funded by approximately $39,000,000." Federal also alleges that the IOC Letter demanded that IFDA "rectify" the "intolerable situation." (Compl. Par. 41). According to Federal, the IOC Letter "requested that IFDA contact the IOC within 7 days and provide written responses to the audit findings within twenty-one days." (Compl. Par. 42). The IOC Letter also allegedly notified IFDA that the IOC was discussing certain issues raised by the audit with the Illinois Department of Financial and Professional Regulation.

Federal alleges that on November 26, 2008, a civil action (Dunkle Action) was filed against IFDA, IFDAS, Defendant Geoff Hurd, Defendant Charles Childs, Defendant Paul Dixon, Defendant Kevin Burke, and Defendant Eric Trimble. According to Federal, the Dunkle Action relates to the same problems with the Trust that were previously identified in the IOC Letter, including IFDAS's alleged payment of an inflated rate of return to IFDA members, an alleged resulting deficit in Trust assets, and other alleged mismanagement of Trust funds. (Compl. Par. 47, 49-

50).  Federal alleges that it received notice of the Dunkle Action on or about

December 18, 2008, and copies of the complaint and amended complaint shortly

thereafter, were tendered under the D&O Section of the 2008 Policy.

Federal also alleges that on January 28, 2009, a derivative action (Calvert

Action) was filed against various "current or former directors and/or officers of

IFDA and/or IFDAS," including Defendant Mark Cullen (Cullen).  (Compl. Par. 51-

52).  Federal alleges that Cullen was the Managing Staff Director of IFDA from

February 2008 until an unknown date, and that Cullen and his law firm provided

legal services to IFDA and the Trust.  According to Federal, the Calvert Action is

based on alleged improper investment of Trust assets, IFDAS's alleged failure to

maintain a valid license to act as a trustee, alleged taking of excessive administrative

fees from the Trust, alleged under-funding of the Trust, and the Trust's alleged

failure to reimburse "pre-paid burial services as contemplated."  (Compl. Par. 54-57).

Federal states that it received a copy of the complaint filed in the Calvert Action on

January 29, 2009, which was tendered under the D&O Section of the 2008 Policy.

The complaint in the Calvert Action allegedly referenced the IOC Letter.

In addition, Federal alleges that on March 25, 2009, IFDA, IFDAS, and

Defendant IFDA Capital, Inc. (IFDA Capital) received grand jury subpoenas

(Subpoenas) seeking documents relating to the Trust and "any loans made by or on

behalf of the Trust." (Compl. Par. 58). Federal states that it received copies of the Subpoenas on April 13, 2009, which was tendered under the D&O Section of the 2008 Policy.

Federal also alleges that on May 21, 2009, another action (Tipsword Action) was filed against IFDA, IFDAS, and various individual "current or former directors and/or officers of IFDA and/or IFDAS," including Cullen. (Compl. Par. 59-60). According to Federal, the Tipsword Action is based on alleged improper investment of Trust assets, alleged failure to maintain a proper license, and alleged taking of excessive administrative fees. Federal states that it received notice of the Tipsword Action on May 27, 2009, which was tendered under the D&O Section of the 2008 Policy, and that it received a copy of the amended complaint in the Tipsword Action shortly thereafter.

As Federal received documents relating the Dunkle Action, the Calvert Action, the Tipsword Action (collectively referred to as the "Litigation"), and the Subpoenas, Federal allegedly acknowledged to Defendants the receipt of such documents. According to Federal, after a series of correspondence with Defendants, Federal ultimately informed Defendants that Federal was denying coverage for the Litigation and the Subpoenas, as well as denying coverage relating to Cullen in his capacity as legal counsel to IFDA and IFDAS. Federal also allegedly provided

notice to Defendants regarding the instant declaratory judgment action. Federal includes in its amended complaint a request for a declaratory judgment finding that the Policies do not provide coverage for the Subpoenas because the Subpoenas do not constitute a Claim under the Policies (Count I), a request for declaratory judgment finding that the 2006 Policy, the 2007 Policy, and the 2008 Policy do not provide coverage for the Litigation or the Subpoenas because the IOC Letter constitutes an Insured Organization Claim under the Policies and the Litigation and the Subpoenas constitute Related Claims under the Policies (Count II), a request for declaratory judgment finding the 2006 Policy, the 2007 Policy, and the 2008 Policy do not provide coverage for the Litigation or the Subpoenas based on Defendants' prior knowledge of the IOC Letter (Count III), a request for declaratory judgment finding the 2006 Policy, the 2007 Policy, and the 2008 Policy do not provide coverage for the Litigation or the Subpoenas based on certain policy exclusions in the 2006 Policy, the 2007 Policy, and the 2008 Policy (Count IV), a request for declaratory judgment finding that the 2005 Policy does not provide coverage for the Litigation or the Subpoenas based on Defendants' failure to provide timely notice regarding the IOC Letter (Count V), and a request for declaratory judgment finding the 2005 Policy does not provide coverage for the Litigation or the Subpoenas based on certain policy exclusions in the 2005 Policy (Count VI). Federal has filed a

motion for summary judgment on Counts I, II, III, and V. Defendants have moved for summary judgment on all Counts, and have suggested that the court stay its decision on the cross motions for summary judgment until such time that Counts IV and VI can be resolved based on the outcome of the Litigation.

## LEGAL STANDARD

Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, reveals that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In seeking a grant of summary judgment, the moving party must identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)(quoting Fed. R. Civ. P. 56(c)). This initial burden may be satisfied by presenting specific evidence on a particular issue or by pointing out "an absence of evidence to support the non-moving party's case." *Id.* at 325. Once the movant has met this burden, the non-moving party cannot simply rest on the allegations in the pleadings, but, "by affidavits or as otherwise provided for in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P.

56(e).  A "genuine issue" in the context of a motion for summary judgment is not simply a "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, a genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986);  *Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 599 (7th Cir. 2000).  The court must consider the record as a whole, in a light most favorable to the non-moving party, and draw all reasonable inferences that favor the non-moving party. *Anderson*, 477 U.S. at 255; *Bay v. Cassens Transport Co.*, 212 F.3d 969, 972 (7th Cir. 2000).  When there are cross motions for summary judgment, the court should "construe all inferences in favor of the party against whom the motion under consideration is made."  *Mote v. Aetna Life Ins. Co.*, 502 F.3d 601, 606 (7th Cir. 2007)(internal quotations omitted); *see also Krieg v. Seybold*, 481 F.3d 512, 516 (7th Cir. 2007).

**DISCUSSION**

I.  Characterization of Subpoenas (Count I)

Defendants argue that summary judgment should be entered in their favor on

Count I, since the Subpoenas constitute Claims under the terms of the Policies, and Federal moves for summary judgment in its favor, contending that the Subpoenas are not Claims under the terms of the Policies. When interpreting an insurance policy, "[b]oth the policy terms and the allegations in the underlying complaint are liberally construed in favor of the insured, and any doubts and ambiguities are resolved against the insurer." *Amerisure Mut. Ins. Co. v. Microplastics, Inc.*, 622 F3d 806, 811 (7th Cir. 2010)(citations omitted). Nonetheless, "the general rules that favor the insured must yield to the paramount rule of reasonable construction which guides all contract interpretations." *Id.* (citations omitted)(internal quotations omitted). When interpreting a contract under Illinois law, a court should "first ask if the language of the contract is ambiguous" or, in other words, whether the terms of the contract "are indefinite or have a double meaning." *Lewitton v. ITA Software, Inc.*, 585 F.3d 377, 379-80 (7th Cir. 2009)(citations omitted). The court interprets a contract "with the goal of effectuating the parties' intent, giving contract terms their plain and ordinary meaning." *Kim v. Carter's Inc.*, 598 F.3d 362, 364 (7th Cir. 2010)(citation omitted).

In the instant action, the Policies contain a D&O Section, which provides coverage for D&O Claims and Insured Organization Claims. (R PSF Par. 8); (PSF Ex. A-D, D&O Section I).

## A. Subpoenas as D&O Claims

Defendants contend that the Subpoenas are D&O Claims because the definition of a D&O Claim includes "a 'formal proceeding' commenced by the filing of a 'formal investigative order.'" (D Resp. 10)(citing D SAF Par. 3). It is undisputed that a D&O Claim is defined as "(a) [a] written demand for monetary damages or non-monetary relief; (b) [a] civil proceeding commenced by the service of a complaint or similar pleading; (c) [a] a civil proceeding commenced by the return of an indictment; or (d) [a] formal administrative or regulatory proceeding commenced by the filing of a Notice of Charges, formal investigative order or similar documents; . . . [a]gainst an Insured Person for a Wrongful Act." (D SAF Par 3); (PSF Ex. A-D, D&O Section, Par. II(D)). It is also undisputed that an Insured Person is defined, in relevant part, as "any past present or future Executive or Employee of the Insured Organization. (R PSF Par. 9)(PSF Ex. A-D, D&O Section, Par. II(J)). Further, it is undisputed that the Subpoenas were directed to IFDA, IFDAS, and IFDA Capital, which are not Insured Persons under the Policies. (R PSF Par. 37). Thus, since the Subpoenas were not directed to Insured Persons, the Subpoenas do not fall within the definition of a D&O Claim under the Policies.

## B. Subpoenas as Insured Organization Claims

In addition, we note that the Subpoenas do not fall under the definition of an

Insured Organization Claim.  It is undisputed that the Policies define the term

Insured Organization Claim to mean, in relevant part, "a written demand for

monetary damages or non-monetary relief; . . . against an Insured Organization for a

Wrongful Act."  (R PSF Par. 9); (PSF Ex. A-D, D&O Section, Par. II(I)(1)).  It is

also undisputed that the term Insured Organization is defined, in relevant part, as "the

Parent Corporation and any Subsidiary. . . . "  (R PSF Par. 10); (PSF Ex. A-D,

GT&C Section, Par. II(H)).  In addition, it is undisputed that a Wrongful Act, as it

relates to an Insured Organization Claim, is defined, in relevant part, as "any error,

misstatement, act, omission, neglect or breach of duty committed, attempted, or

allegedly committed or attempted, by . . . any Insured Organization."  (R PSF Par.

10); (PSF Ex. A-D, D&O Section, Par. II(U)(1)(b)).  The record shows that the

Subpoenas "sought documents relating to the [Trust] and to any loans made by or on

behalf of the [Trust]."  (R PSF Par. 37); (PSF Ex. K).  In addition, the record shows

that the Subpoenas do not allege Defendants engaged in any Wrongful Acts.  (PSF

Ex. K).  Therefore, the Subpoenas do not fall under the definition of an Insured

Organization Claim under the terms of the Policies.  Based on the above, we find that

the Subpoenas do not meet the definition of either a D&O Claim or an Insured

Organization Claim under the terms of the Policies, and thus the Policies do not

provide coverage with respect to the Subpoenas.  Therefore, we grant Federal's

motion for summary judgment on Count I, and we deny Defendants' motion for summary judgment on Count I.

## II.  Characterization of IOC Letter and Relatedness of Claims (Count II)

If the IOC Letter is a Claim, then the IOC Letter, the Litigation, and the Subpoenas would be Related Claims, and since Defendants failed to provide sufficient notice of the IOC Letter to Federal, then the Policies would not cover the Litigation or the Subpoenas, even if the Subpoenas constituted Claims.  Thus, Defendants contend that summary judgment should be granted in their favor on Count II, since the IOC Letter is not a Claim under the terms of the Policies and the Litigation and the Subpoenas, and if they are Claims, they constitute "separate and distinct claims made in separate policy periods."  (D Mot. Par. 6-7).  Federal also moves for summary judgment on Count II, arguing that the IOC Letter is a Claim under the terms of the Policies and that the IOC Letter, the Litigation, and the Subpoenas (if the Subpoenas are Claims) are Related Claims.

### A.  Status of IOC Letter

The parties have agreed that the IOC Letter is not properly characterized as a D&O Claim under the terms of the Policies.  However, the parties disagree as to

whether the IOC Letter constitutes an Insured Organization Claim under the terms of the Policies.  As discussed above, it is undisputed that the Policies define the term Insured Organization Claim to mean, in relevant part, "a written demand for monetary damages or non-monetary relief; . . . against an Insured Organization for a Wrongful Act."  (R PSF Par. 9); (PSF Ex. A-D, D&O Section, Par. II(I)(1)).  It is also undisputed that the term Insured Organization is defined, in relevant part, as "the Parent Corporation and any Subsidiary. . . . "  (R PSF Par. 10); (PSF Ex. A-D, GT&C Section, Par. II(H)).  In addition, it is undisputed that a Wrongful Act, as it relates to an Insured Organization Claim, is defined, in relevant part, as "any error, misstatement, act, omission, neglect or breach of duty committed, attempted, or allegedly committed or attempted, by . . . any Insured Organization."  (R PSF Par. 10); (PSF Ex. A-D, D&O Section, Par. II(U)(1)(b)).  Such language is unambiguous, and the court must therefore "enforce [the Policies] as written. . . ."  *Curia v. Nelson*, 587 F.3d 824, 829 (7th Cir. 2009)(stating that a contract is not ambiguous simply because the parties offer different interpretations of its language).

### 1.  Letter as a Written Demand for Non-Monetary Relief

Defendants argue that the IOC Letter is not a written demand for non-monetary relief against IFDA because it "contains no mention of damages being

sought. . . ."  (D Memo 6).  However, a written demand for non-monetary relief, by

its explicit terms, would not include any mention of damages being sought.

Defendants also argue that the IOC Letter is not a written demand for non-

monetary relief because the letter does not mention any "action being taken against

the 'business' of IFDA or any other Defendants named in [the instant] action, nor

threat of either."  (D Memo 6).  However, it is undisputed that the IOC Letter

references $8.6 million in "unauthorized excess fees" taken from the Trust by

IFDAS, an additional $793,165 "owed" to the Trust, and an under-funding of the

Trust by approximately $39 million.  (R PSF Par. 16-17); (PSF Ex. F).  In addition, it

is undisputed that the IOC Letter stated that the under-funding of the Trust was "an

intolerable situation that IFDA must rectify."  (R PSF Par. 18); (PSF Ex. F).  Further,

it is undisputed that the IOC Letter threatened to take action against IFDA if IFDA

failed to "contact the IOC within seven (7) days" or "respond affirmatively, in

writing, to each finding . . . within twenty-one (21) days," and that the IOC Letter

stated that "failure to adhere to these timeframes and/or . . . failure to respond

satisfactorily will be met with appropriate IOC actions."  (R PSF Par. 19);(PSF Ex.

F).  Finally, it is undisputed that the IOC Letter indicated that the IOC had "serious

concerns regarding the state of the [T]rust and the overall lack of formal compliance

procedures" and that the IOC was "conferring with the Illinois Department of

14

Financial and Professional Regulation concerning issues that may be under their jurisdiction as the primary state government regulator of Illinois corporate fiduciaries and Illinois-licensed credit unions." (R PSF Par. 20);(PSF Ex. F). Such statements by the IOC indicate that there was action being taken against IFDA with respect to the issues raised in the IOC Letter.

Defendants also argue that the IOC Letter did not threaten civil action and instead related only to administrative review. The record is clear that the Policies define an Insured Organization Claim as either a "written demand for monetary damages or non-monetary relief," or as "a civil proceeding commenced by the service of a complaint or a similar pleading. . . ." (R PSF Par. 9); (PSF Ex. A-D, D&O Section, Par. II(I)(1)). The court declines to read into the definition of an Insured Organization Claim the requirement that "a written demand for non-monetary relief" also include an explicit threat of civil action. Had the parties wanted to define the term Insured Organization Claim in such a manner, they could have easily done so. Instead, the term Insured Organization Claim is defined broadly to include any "written demand for monetary damages or non-monetary relief." (R PSF Par. 9); (PSF Ex. A-D, D&O Section, Par. II(I)(1)).

Defendants argue that the IOC Letter should merely be characterized as a request for responses to routine audit findings or for compliance with an audit. In

support of their argument, Defendants point out that the closing sentence of the IOC Letter stated that the IOC "look[ed] forward to working with the IFDA to resolve th[e] situation." (PSF Ex. F). However, we must consider the text of the IOC Letter in its entirety. The IOC Letter undisputedly identifies various forms of non-monetary relief that the IOC was seeking that related to Defendants' administration of the Trust. In addition, it is not logical that $39 million under-funding of the Trust would be deemed as a routine audit finding, as Defendants suggest. The mere fact that a serious letter ends with a polite statement does not negate the contents of the letter. Thus, we find that the IOC Letter constitutes a written demand for non-monetary relief.

### 2. Wrongful Acts Identified in IOC Letter

Defendants also argue that the IOC Letter does not meet the definition of an Insured Organization Claim, since the IOC Letter does not identify any Wrongful Act allegedly undertaken by Defendants. (D SJ Memo 6). However, as already indicated, the IOC Letter specifically indicated $8.6 million in "unauthorized excess fees" taken from the Trust by IFDAS, an under-funding of the Trust by approximately $39 million, and an "overall lack of formal compliance procedures" by Defendants. (R PSF Par. 16-17, 20); (PSF Ex. F). Thus, the IOC Letter identified

Wrongful Acts that Defendants may have performed with respect to the Trust.

### 3.  Defendants' Reliance on *Gibraltar*

In arguing that the IOC Letter is not a Claim, Defendants rely heavily upon the Illinois Appellate Court's ruling in *Gibraltar Cas. Co. v. A. Epstein and Sons, Intern., Inc*., 562 N.E.2d 1039 (Ill. App. Ct. 1990).  In *Gibraltar*, the insurance policy at issue defined the word "claim" as an "allegation."  *Id.* at 1045.  The court in *Gibraltar* found that because the letter sent to the insured did not "specify the alleged negligent acts, [or] the employees involved or the type of damage incurred," the letter was too general to constitute a claim under the terms of the policy at issue in that case.  *Id.*  In contrast, the Policies at issue in the instant action broadly define an Insured Organization Claim, in part, as a "written demand for monetary damages or non-monetary relief. . . ."  (R PSF Par. 9); (PSF Ex. A-D, D&O Section, Par. II(I)(1)).  Further, as noted above, the IOC Letter specifically alleges that IFDAS took $8.6 million in "unauthorized excess fees," that the Trust was under-funded by approximately $39 million, and that there was an "overall lack of formal compliance procedures."  (R PSF Par. 16-17, 20); (PSF Ex. F).  Thus, the facts in this case are distinguishable from the facts in *Gibraltar*.

4.  Effect of Subsequent Litigation on Characterization of IOC Letter

Defendants also contend that the "trust participants did not activate or participate in the audits conducted by the IOC each year, and thus the [Litigation] and the audit should not be so intimately tied together as to qualify the IOC [L]etter as a true claim."  (D Memo 6).  As shown above, the court's analysis as to whether the IOC Letter is a Claim under the terms of the Policies in no way relates to the subsequent filing of the Litigation or issuance of Subpoenas.  Instead, the court has examined the content of the IOC Letter in its entirety to determine whether the IOC Letter, taken by itself, falls under the definition of an Insured Organization Claim. Based on the above, we find that the IOC Letter constitutes an Insured Organization Claim under the specific terms of the Policies at issue in this case.

B.  Relatedness of Claims

Defendants argue that even if the IOC Letter is an Insured Organization Claim, the Litigation and Subpoenas (if the Subpoenas are Claims) are each separate and distinct Claims that do not relate back to the IOC Letter.  Federal argues that the IOC Letter, the Litigation, and the Subpeonas (if the Subpoenas are Claims) are Related Claims under the terms of the Policies.  It is undisputed that, under the terms of the Policies, Related Claims are "all Claims for Wrongful Acts based upon, arising

from, or in consequences of the same or related facts, circumstances, situations, transactions or events or the same or related series of facts, circumstances, situations, transactions or events." (R PSF Par. 10); (PSF Ex. A-D, GT&C Section, Par. R). The record shows that the IOC Letter identified the taking of excessive management fees, the under-funding of the Trust, an overall lack of compliance with respect to administration of the Trust, and possible action by the IOC or the Illinois Department of Financial and Professional Regulation. (R PSF Par. 16-20); (PSF Ex. F). In addition, it is undisputed that the complaints filed in the Litigation reference the IOC's investigation of IFDA and that the Litigation relates to an "alleged deficit in the Trust, improper investment of Trust funds and the overall mismanagement of the Trust." (R PSF Par. 25, 27, 32-36, 40-41); (PSF Ex. I, Par. 2, 3, 6, 37, 39); PSF Ex. J, Par. 2-5, 7-8, 73-75, 83, 89, 90, 97, 121, 124, 133, 136, 140, 144, 148, 153, 155, 204-05, 250-51, 253, 257, 258); (PSF Ex. L, Par. 60, 79, 87, 89, 91, 98-99). Further, even if the Subpoenas did constitute Claims under the terms of the Policies, it is undisputed that the Subpoenas sought information regarding IFDA's, IFDAS's, and IFDA Capital's management of the Trust. (R PSF Par. 37); (PSF Ex. K). Thus, the Litigation and Subpoenas are based on the same facts and circumstances as the IOC Letter.

Defendants contend that since the IOC Letter was addressed only to IFDA,

and not to any individual Defendants, the Litigation brought against the individual Defendants could not be related to the IOC Letter. Defendants also point out that the Litigation has not been consolidated into one lawsuit, and that the lawsuits are each different in terms of damages sought, theories under which they proceed, the venues chosen, and the parties involved. However, based on the definition of Related Claims within the specific Policies at issue, it is irrelevant whether the IOC Letter was directed to any of the individual Defendants, whether the plaintiffs in the Litigation were involved in any way with the IOC Letter, or whether the lawsuits themselves are different in terms of damages sought, legal theories advanced, venue, and parties. Under the Policies, the only relevant inquiry is whether the Claims are "based upon, arising from, or in consequences of the same or related facts, circumstances, situations, transactions or events or the same or related series of facts, circumstances, situations, transactions or events." (R PSF Par. 10); (PSF Ex. A-D, GT&C Section, Par. R).

Defendants also contend that the IOC did not take any action against the Trust until much later than June 21, 2006, when IFDA received the IOC Letter, and that there is "no direct link between the request contained within the IOC Letter and the [Litigation and Subpoenas] . . . , other than the fact that the Trust was involved." (D Resp. 10). As discussed above, the Litigation and Subpoenas are based on the

same facts and circumstances as the IOC Letter.  Thus, the Litigation and the

Subpoenas (if the Subpoenas did constitute Claims under the terms of the Policies)

meet the definition of Related Claims under the Policies.  Further, it is undisputed

that the Litigation occurred in response to the Illinois Department of Financial and

Professional Regulation's eventual rescission of IFDA's trust license and the

rollover of Trust assets into account to be overseen by a new trustee, both of which

were consequences that flowed from the IOC Letter.  (D Memo 2).  Thus, there is a

direct link between the IOC Letter and the Litigation.  Based on the above, we find

that the IOC Letter, the Litigation, and the Subpoenas are Related Claims under the

terms of the Policies.  Therefore, we grant Federal's motion for summary judgment

on Count II, and we deny Defendants' motion for summary judgment on Count II.


III.  Timing of Notice of IOC Letter (Count V)

Defendants move for summary judgment on Count V, arguing that, even if

the IOC Letter, the Litigation, and the Subpoenas are Related Claims, IFDA

provided adequate notice of such Claims to Federal.  Federal also moves for

summary judgment on Count V, arguing that Defendants did not provide the

required notice of the IOC Letter under the terms of the 2005 Policy.

## A.  Actual Notice Through IFDA's Broker

Defendants argue that Federal received actual notice of the IOC Letter based on IFDA's discussions with its insurance broker relating to increasing coverage.  It is undisputed that "on or about April 2, 2007, Penny Kynion, broker for IFDA, who placed insurance with Federal, among other insurers, wrote to IFDA indicating Federal's refusal to increase D&O Coverage beyond the current $5 million limit in the subject 2006-2007 policy pursuant to IFDA's request for increased coverages amounts."  (D SAF Par. 7);(D SAF, Ex. A).  In addition, it is undisputed that the broker identified the cost of increasing IFDA's coverage amounts through other insurers, and asked that IFDA follow-up with her if IFDA was interested in pursuing such coverage through other insurers.  (D SAF, Ex. A).  Thus, Defendants have not pointed to sufficient evidence to show that IFDA ever discussed the IOC Letter or Trust with its insurance broker, or that the insurance broker was acting in the capacity of an agent or representative of Federal such that notice to the broker would constitute notice to Federal.

Defendants argue that the issue of whether Federal received actual notice of the IOC Letter requires "further factual inquiry into the nature of the correspondence and conversations between the broker and Federal."  (D Rep. 8).  However, discovery has closed in this case, and therefore, Defendants' opportunity

for such factual inquiry has ended.  Based on the above, Defendants have not

pointed to sufficient evidence to show that Federal received actual notice of the IOC

Letter through IFDA's insurance broker.


        B.  Constructive Notice Based on Requested Increase in Coverage

        Defendants argue that the fact that IFDA requested an increase in its coverage

amount should have put Federal on constructive notice of the IOC Letter, since

Federal would have undertaken at least a minimal evaluation of risk associated with

the increase request before denying it.  Defendants have not pointed to any evidence

in the record to indicate that Federal actually undertook such an evaluation.  In

addition, the case cited by Defendants, *Ulrich Children's Advantage Network v.*

*Nat'l Union Fire Co. of Pittsburgh, PA,* 2010 WL 395645 (Ill. App. Ct. 2010), does

not actually stand for the proposition that an insurer is placed on constructive notice

of a claim based on the insured's desire to increase its policy limits.  *Id.* at *7-10.  In

fact, the court in *Ulrich* addressed whether the estoppel doctrine relating to policy

defenses is applicable to claims-made policies and did not address constructive

notice of a claim or an increase in policy limits.  *Id.*  Thus, Defendants have not

pointed to sufficient evidence to show that Federal had constructive notice of the

IOC Letter.

C.  Notice Requirements Under the Policies

Defendants argue that if the IOC Letter is a Claim, then all Policies afford coverage because "they involve continued and ongoing communications and demands related to the IOC Letter."  (D Resp. 3).  However, it is undisputed that the Policies are claims-made policies, which provide coverage for Claims "first made against [the] Insured during the Policy Period."  (R PSF Par. 8); (PSF Ex. A-D, D&O Section I).  Under a claims-made policy, "the insured need not provide notice of every possible event out of which coverage may arise, but only of claims made." *University of Illinois v. Continental Cas. Co.*, 599 N.E.2d 1338, 1354 (Ill. App. Ct. 1992)(citation omitted).  As discussed above, the IOC Letter constitutes a Claim under the specific terms of the Policies at issue.  Thus, the issue is whether Federal received timely notice of the IOC Letter.

Illinois state courts have indicated that "a claims-made policy imposes a more rigid notice requirement [than an occurrence-based policy], because it links coverage to the claim and notice rather than to the injury" and that "[t]iming of [the claim] and notice determines which policy applies-if any does."  *Home Ins. Co. of Illinois v. Adco Oil Co.*, 154 F.3d 739, 742 (7th Cir. 1998).  In addition, Illinois state courts have stated that "the purpose of the notice provision is to allow the insurer to make a prompt and thorough investigation to determine the question of and extent of

liability." *University of Illinois*, 599 N.E.2d at 1354 (citation omitted).

Under the Policies, Defendants were required to notify Federal of any Claim, in writing, "as soon as practicable" and to provide Federal "such information and cooperation as [Federal] m[ight] reasonably require, including but not limited to a description of the Claim . . . or circumstances, the nature of the alleged Wrongful Act, the nature of the alleged or potential damage, the names of the actual or potential claimants, and the manner in which [Defendants] first became aware of the Claim . . . or circumstances." (R PSF Par. 11); (PSF Ex. A-D, GT&C Section, Par. VII(A)). The record shows that the IOC Letter was sent to IFDA on June 21, 2006. (R PSF Par. 15). Thus, the IOC Letter constitutes a Claim first made during the 2005 Policy period. Further, it is undisputed that, under the Policies, Related Claims are "treated as a single Claim made when the earliest of such Related Claims was first made, or . . . treated as having been made." (R PSF Par. 11); (PSF Ex. A-D, GT&C Section, Par. VII(A)(4)). Thus, as Related Claims, the IOC Letter, the Litigation, and the Subpoenas, if they were Claims, all constitute Claims made against Defendants during the 2005 Policy period. In addition, it is undisputed that Defendants did not provide notice of the IOC Letter during the 2005 Policy period. (R PSF 51). It is further undisputed that Defendants did not provide Federal with notice of a Claim until December 18, 2008, more than two years after IFDA

received it, and that Defendants did not provide Federal a copy of the IOC Letter until February 10, 2009. (R PSF Par. 52, 53). Thus, the undisputed facts show that Federal did not receive timely notice of IOC Letter. Based on the above, even if the Subpoenas did constitute Claims, Defendants have not pointed to sufficient evidence to show that they satisfied the notice requirements of the 2005 Policy, and thus, the Policies do not provide coverage for the IOC Letter, the Litigation, or the Subpoenas. Therefore, we grant Federal's motion for summary judgment on Count V, and we deny Defendants' motion for summary judgment on Count V.


IV. Effect of Prior Knowledge of the IOC Letter (Count III)

Defendants argue that their prior knowledge of the IOC Letter does not disqualify the Litigation and Subpoenas from being covered under the 2006 Policy, the 2007 Policy, or the 2008 Policy. The Seventh Circuit has stated that "[a] known loss occurs when the insured knows or has reason to know, when it purchases a[ ] policy, that there is a substantial probability that it will suffer or has already suffered a loss." *Grey Direct, Inc. v. Erie Ins. Exchange*, 460 F.3d 895, 899 (7th Cir. 2006)(citation omitted)(internal quotations omitted). In addition, the Seventh Circuit has indicated that Illinois law recognizes the known loss doctrine. *Id.* The known loss doctrine provides that "the insurer has no duty to defend or indemnify

the insured with respect to the known loss *ab initio,* unless the parties intended the known loss to be covered." *Id.* (citation omitted)(internal quotations omitted); *see also Outboard Marine v. Liberty Mut. Ins.,* 607 N.E.2d 1204, 1210 (Ill. App. Ct. 1992)(stating that "where the insured has evidence of a probable loss when it purchases a[n insurance] policy, the loss is uninsurable under that policy (unless the parties otherwise contract) because the risk of liability is no longer unknown")(citation omitted)(internal quotations omitted).  Defendants argue that it would have been impossible, based on the IOC Letter, to foresee the filing of the Litigation or the issuance of the Subpoenas, and that the IOC Letter logically only put Defendants on notice of possible future actions that would be taken by the IOC, not of private lawsuits by individuals not involved in correspondence with the IOC. However, Defendants' argument is undermined by the undisputed fact that, based on the IOC audit findings, Defendants sought to increase the amount of coverage under the Policies in early 2007.  (D Resp. 3-4); (D SAF, Par. 7).  Thus, even if the IOC Letter, the Litigation, and the Subpoenas did not constitute Related Claims under the Policies for which Federal did not receive proper notice, Defendants' prior knowledge of the IOC Letter would disqualify coverage of the Litigation and Subpoenas based on the known loss doctrine.  Therefore, we grant Federal's motion for summary judgment on Count III, and we deny Defendants' motion for summary

judgment on Count III.

## V.  Defendants' Request for a Stay

Defendants have requested that the court stay its decision on the cross

motions for summary judgment until Counts IV and VI can be resolved based on the

outcome of the Litigation.  Counts IV and VI relate to certain policy exclusions that

would be at issue if the court had ruled in Defendants' favor on Counts I, II, III, and

V.  However, based on our rulings in favor of Federal on Counts I, II, III, and V,

Counts IV and VI are moot.  Therefore, Counts IV and VI are dismissed as moot.

## VI.  Coverage of Cullen in his Capacity as Legal Counsel

Defendants also argue that Cullen is insured under the Policies in his capacity

as legal counsel to IFDA.  We note that while Federal raised this issue, the argument

does not relate to any counts in the complaint.  It is undisputed that the definition of

an Insured Person includes "any past, present or future Executive . . . of the Insured

Organization" and that the definition of an Executive includes "[i]n-house general

counsel of any Insured Organization. . . ."  (R PSF Par. 9); (D SAF Par. 2); (PSF Ex.

A-D, GT&C Section, Par. II(F)).  In addition, it is undisputed that when Cullen

served as counsel to IFDA and the Trust, he worked for the law firm Sorling,

Northup, Hanna & Cullen. (R PSF Par. 6). Thus, Cullen was not in-house counsel for IFDA and Cullen therefore would not qualify as an Insured Person under the terms of the Policies in his capacity as IFDA's legal counsel.

## CONCLUSION

Based on the foregoing analysis, we grant Federal's motion for summary judgment on Counts I, II, III, and V, and we deny Defendants' motion for summary judgment. We also dismiss Counts IV and VI of the amended complaint as moot.

Samuel Der-Yeghiayan
United States District Court Judge

Dated: December 8, 2010